UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KEVIN GROS OFFSHORE, LLC | CIVIL ACTION |
| VERSUS | NO. 07-7340 |
| MAX WELDERS, INC. | SECTION "F" |

ORDER AND REASONS

Before the Court is the defendant's Motion for Summary Judgment. For the reasons that follow, the motion is DENIED.

## Background[1]

On March 31, 2006, Kevin Gros Consulting & Marine Services, Inc. entered into a bareboat charter with Blue Bayou Offshore, LLC for the M/V IMILOA. Kevin Gros Offshore, LLC (KGO), an affiliate of Kevin Gros Consulting and Marine Services, Inc., was the vessel operator.

At some point before the charter was signed, KGO personnel determined that the vessel's pressure tank system, used for storing and offloading bulk cargo, was operational and that the internal

---

[1] These facts are taken from the parties' factual recitations in their papers and from the scant record evidence, which includes three deposition transcripts, a declaration from plaintiff's vice president and accompanying exhibits: an invoice and letter from plaintiff to defendant.

1

canvas fabric slides and socks were in good condition. According to KGO, no burn holes were observed in the slides and socks at that time.[2] However, KGO personnel determined that the hatch covers, or manways, to the four pressure tanks on the vessel were defective and in need of repair.

KGO hired Max Welders to make the repairs: to replace manways/access hatches on the tops of the pressure tanks. No written repair order or contract was signed. But from March 30, 2006 to April 6, 2006, Max Welders repaired and altered the hatch covers.[3] The KGO engineer on the vessel stayed on board the vessel while it was in Max Welders' yard. Max Welders' project manager and foreman on the job both stated in their depositions that Max Welders asked KGO's vessel crew to remove the slides but they did not, so fire retardant blankets and boards were put down as a barrier inside the tanks, underneath the hatches, to protect the interior of the pressure tanks by preventing slag damage to the slides or socks when the hatch work was done.

When the repair work was finished, on April 7, 2006, the

---

[2] No independent surveyor was hired to document the condition of the hull and equipment of the M/V IMILOA at the commencement of the bareboat charter.

[3] Max Welders asserts that it was not engaged to inspect or repair the vessel's pressure tank pumping system or the interiors of the vessel's pressure tanks. KGO counters that the work of Max Welders involved welding inside the pressure tanks: "The scope of work to be undertaken by Max Welders in repairing the hatch covers necessitated welding inside the pressure tanks."

2

vessel left Max Welders' yard and proceeded offshore to deliver cargo and supplies, including the bulk cargo of dry cement and barite that was in the pressure tanks.[4] Because the vessel encountered a series of problems unrelated to the pressure tanks, the first attempt to offload bulk cargo was delayed until April 14, 2006. It was then that the pressure tank system failed in the offloading operation.

In an invoice dated April 17, 2006, Max Welders billed KGO $19,105.32 for its repair work. KGO never paid the invoice.

After returning to shore on April 15, 2006, the pressure tanks still could not function to offload the bulk cargo, and an independent company was hired to remove the cargo from the tanks using an external system.

After the tanks were emptied and vacuumed out, another contractor, D.J. LeBlanc Services, was hired to repair the tanks. (Max Welders had not yet been advised of the damage to the pressure tanks). Daniel LeBlanc of D.J. LeBlanc Services discovered that the slides and socks in all four tanks were burned and that in the tanks was "slag", or pellets, which is a byproduct of welding. The burn holes in the slides and socks had prevented the pressure tanks

---

[4] Max Welders contends that KGO accepted the repaired vessel with no exception noted; KGO contends that, at the time it retrieved the vessel, there was no reason to inspect the slides and socks and that the first opportunity to use the pressure tanks system did not occur until a week after Max Welders completed its work. According to KGO, there was no intervening use of or work to the interior of the pressure tanks.

systems from operating properly.

On June 6, 2006, a KGO representative, Keith Bergeron, contacted Michael Clark of Max Welders and informed him of the damage to the slides and socks of the IMILOA and said that the damage was caused by the bad welding work of Max Welders. On that same day, Bergeron met with Clark to show him the slides and socks which had been removed from the vessel. Bergeron gave Clark an itemized invoice detailing the $81,457.80 in damages KGO claimed as a result of the burn holes in the socks and slides,[5] as well as a supporting written statement from Daniel LeBlanc.

By letter dated July 26, 2006, Byron Allemand, the vice president of KGO, received a request from Max Welders' insurance risk managers for documentation to support the invoice. The next day, Mr. Allemand responded and provided photographs of some of the damaged slides and socks; he also offered to have Max Welders send out its own surveyor. That same day, Mr. Allemand wrote to Max Welders detailing the damages and reiterating KGO's demand for reimbursement.

From that time through September 2007, both sides tried to resolve the dispute. When Max Welders' insurance risk managers

---

[5] KGO asserts that its damages from the failure of the pressure system to operate include but are not necessarily limited to the cost of repair of the pressure tanks ($19,010.30), the cost to have the bulk cargo removed and the tanks vacuumed ($8,397.50), the cost of the bulk cargo lost (barite and cement) ($4,020 and $17,030 respectively), and the loss of charter hire for the days that the vessel could fulfill its obligations ($33,000).

made it clear that Max Welders would not take responsibility to reimburse KGO, KGO sued Max Welders in this Court on October 25, 2007, asserting that Max Welders breached its warranty of workmanlike performance under general maritime law because improper repairs caused internal damage to the pressure tanks' slides and socks.

Max Welders now moves for summary judgment, seeking dismissal of all of plaintiff's claims against it for damage to the vessel (because the claim is barred by laches, or, alternatively, that the plaintiff cannot satisfy its burden of proof) and asks that the Court summarily grant Max Welders' counterclaim for the cost of Max Welders' repairs to the vessel.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

A. The Doctrine of Laches

The doctrine of laches "is founded on the notion that equity aids the vigilant and not those who slumber on their rights." Nat'l Assn. Of Gov't Employees v. City Public Service Bd. Of San Antonio, Texas, 40 F.3d 698, 708 (5th Cir. 1994) (quoting NAACP v.

NAACP Legal Defense & Education Fund, Inc., 753 F.2d 131, 137 (D.C. Cir.), cert. denied, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985)). Laches is an affirmative defense fatal to a claim when a plaintiff's delay in asserting a claim results in prejudice to the other party; it is a complete defense regardless of whether the state statute of limitations has run. See Esso Int'l, Inc. v. SS CAPTAIN JOHN, 443 F.2D 1144, 1150 (5th Cir. 1971). Whether a defendant succeeds on a defense of laches "is a question of fact to be decided by the court after weighing the equities." Id. In maritime or admiralty actions,[6] the Fifth Circuit imposes a three-part test to analyze the strength of a laches defense: (1) whether there was delay in asserting a claim; (2) whether the delay was excusable; and (3) whether the delay resulted in undue prejudice to the party against whom the claim is asserted. See West Wind Africa Line, Ltd. v. Corpus Christi Marine Services, Co., 834 F.2d 1232, 1234 (5th Cir. 1988) (citing Mecom v. Levingston Shipbuilding Co., 622 F.2d 1209 (5th Cir. 1980)). Which party bears the burden of proof on the second and third parts of the test depends on a

---

[6] Any contract for the repair of a vessel is a maritime contract, and therefore is governed by maritime law. See Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir. 1982). Under maritime law, "a shipowner has a maritime cause of action whether he sues in contract for its breach by a person with whom there was a contract for repairs of the vessel, or in tort for the negligent performance of the maritime contract." See Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir. 1982); see also La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10, 16 (1st Cir. 1997).

determination of the first part of the test - whether there was a delay in asserting the claim.

1. Delay

The Court must first determine whether there was delay in asserting the claim under the prescriptive period or statute of limitations for the most analogous statute. See Mecom, 622 F.2d at 1215[7]; Robert B. Miller & Assocs., Inc. v. M/V RENEE, No. 00-3808, 2001 WL 515249, at *2 (E.D.La. May 10, 2001). If the analogous statute of limitations has run, a presumption of laches arises, and the burden shifts to the plaintiff to demonstrate that the delay was excusable *or* that the defendant was not prejudiced by the lapse of time. See Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 233 (5th Cir. 1984).

The defendant asserts that this lawsuit is one for property damage, for which the statute of limitations for the most analogous statute is one year under Louisiana's statute governing torts. See La. Civ. Code art. 3492. The plaintiff counters that its claim arises out of a repair contract, and that it expressly alleged in its complaint that Max Welders breached its warranty of workmanlike performance under the general maritime law. Accordingly, says plaintiff, the analogous limitations period is the ten year period applicable for breach of contract. See La. Civ. Code art. 3499.

---

[7] "[T]he analogy rule serves primarily to determine where rests the burden of proof." Id.

Whether a property damage claim arising out of improper repairs to a vessel sounds in contract or tort seems at first to be a rather metaphysical matter. The First Circuit has explained:

> A ship repairer potentially faces three sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of <u>Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.</u>, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). A ship repairer may also be liable for the maritime tort of negligence. Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to the implied warranties in land-based contracts under the Uniform Commercial Code . . ., "a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence." Finally, federally developed maritime law applies both when a court construes the terms of the repair contract and when it construes the standard of performance thereunder.

<u>La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc.</u>, 124 F.3d 10, 16 (1st Cir. 1997). The Fifth Circuit has observed that a shipowner/plaintiff has a maritime cause of action whether it seeks to recover in contract on the theory that the defendant

9

breached its warranty of workmanlike service,[8] or in tort on the

---

[8] The Court notes that there is some support for the notion that the doctrine of implied warranty of workmanlike performance is on the verge of judicial extinction. Indeed, the Fifth Circuit has described the doctrine as "withered" and has refused "to extend the doctrine beyond those controversies involving the special rules governing the obligation and liability of shipowners which necessitated its formulation." See Nathaniel Shipping, Inc. v. General Electric Co., 920 F.2d 1256, 1264 (5th Cir. 1991) (citations omitted); see also Verdin v. C & B Boat Co., Inc., 860 F.2d 150, 156 (5th Cir. 1988) (noting "[w]e have called into question the continuing vitality of Ryan indemnity in a case such as this one where there was concurrent negligence on the part of the vessel owner"); see also LCI Shipholdings, Inc. v. Muller Weingarten AG, No. 04-30937, 2005 WL 2901908, 153 Fed.Appx. 929 (5th Cir. Nov. 4, 2005) (unpublished) (citing cases doubting the continued vitality of the Ryan approach outside the personal injury context and noting that "[b]ecause this case is outside the personal injury/seaworthiness context, we find no basis for the application of the theory of breach of a WWLP"); see also Scapa Forming Fabrics v. Blue Anchor Line, 243 Fed.Appx. 846, 2007 A.M.C. 2108 (5th Cir. July 2, 2007) (unpublished) (rejecting theory of indemnification based on implied warranty of workmanlike performance, noting that "this court has already rejected this theory in cargo damage cases").

This Court is convinced, however, that the line of cases limiting the doctrine are themselves limited to the context of third-party indemnity actions: where a plaintiff has sued a third-party, with whom it was not in privity of contract, for breach of the warranty of workmanlike performance. The warranty apparently remains viable as a contract doctrine. See Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n.17 (5th Cir. 1989)("[a]dmiralty law, of course, recognizes an implied warranty of workmanlike service which arises from contractual relationships"). Accord Ensco Marine Co. v. Bird-Johnson, No. 03-489, 2004 WL 2984338, at *8-10 (E.D. La. Dec. 15, 2004) (Vance, J.) (finding, after bench trial, that company that performed repair work aboard vessel breached its warranty of workmanlike service); B & B Schiffahrts GMBH & Co. v. American Diesel & Ship Repairs, Inc., 136 F. Supp. 2d 590, 597 (E.D. La. 2001) (Barbier, J.); Caribbean Bulk Carriers, Ltd. v. Motor-Services Hugo Stamp, Inc., No. 94-1437, 1996 WL 210716, at *3 (E.D. La. Apr. 26, 1996) (Duval, J.) (citing Fifth Circuit literature recognizing the implied warranty and noting that it is one which means that "the obligor in a service contract has a duty to perform his or her task with reasonable care, skill, and diligence").

theory that the defendant was negligent in repairing the vessel. Alcoa Steamship Co. V. Charles Ferran & Co., Inc., 383 F.2d 46, 49-50 (5th Cir. 1967).

The warranty of workmanlike performance means that the obligor in a service contract has the duty to perform his services with reasonable care, skill, and diligence. Caribbean Bulk Carriers, Ltd. v. Motor-Services Hugo Stamp, Inc., No. 94-1437, 1996 WL 210716, at *3 (E.D. La. Apr. 26, 1996) (Duval, J.); see also T. Schoenbaum, 1 Admiralty and the General Maritime Law § 5-8 at 219 (4th ed. 2004). The plaintiff explicitly pleaded this concept in its complaint.[9] The Court agrees that this action sounds in contract, and that the ten-year statute of limitations governing contracts is the most analogous. See Garner v. Cities Service Tankers Corp., 456 F.2d 476, 481 n.7 (5th Cir. 1972) (the warranty of workmanlike performance "is contractual in nature and an action for its breach is not changed from one for breach of contract to

---

[9] The object of the contract was for Max Welders to replace the manways or access hatches on top of four tanks, and implied in the oral contract was for this to be accomplished in a workmanlike manner. Indeed, according to the defendant, when the plaintiff refused to remove the slides and socks in the pressure tank, the defendant took precautions by using fire retardant blankets and wood tanks to protect the slides and socks. The plaintiff asserts that the defendant breached its warranty of workmanlike performance and that the defendant's failure to properly repair the pressure tank system has caused the plaintiff to incur damages of approximately $100,000, which include costs to restore the pressure tanks, replace internal parts, and offload cargo by other means. The defendant counters that it performed its welding and limited repairs in a non-negligent and workmanlike manner.

one for tort simply because recovery may turn upon the standard of performance of services"); see also Holden v. Placid Oil Co., 512 F. Supp. 644, (E.D. La. 1981) (noting that, "[i]mplicit in every [breach of repair contract] is an implied obligation that the work will be performed in a skillful, careful, diligent, and good workmanlike manner" and determining that, since the plaintiff framed the complaint in contractual instead of tort language, the ten year prescriptive period applied).[10]

---

[10] In the early history of the common law, the writs and pleading regime structured clear doctrinal separations between contract and tort. See 4 Corbin on Contracts § 957 (1951 ed.) ("Under the older systems of procedure there were various 'forms of action' that purported to be mutually exclusive in some degree, in each of which the remedy was a limited one."); see also Langford v. United States, 101 U.S. 341, 345 (1880) (observing "the distinction between actions arising out of contracts, as distinguished from those founded on torts, which is inherent in the essential nature of judicial remedies under all systems, and especially under the system of the common law"); Hallidie v. Enginger, 166 P. 1, 2 (Cal. 1917) (noting that if a suitor at common law "waived the tort and sued in contract, his writ and declaration charged upon contract only," and [i]f he waived his contract and sued in tort, the writ and declaration charged in tort only"). As the common law matured, the theoretical function and purpose of pleading essentials evolved so as to blur those doctrinal idiosyncrasies and elements of contract and tort seem at times to have become shades of each other. See, e.g., Dold v. Outrigger Hotel, 501 P.2d 368, 372 (Haw. 1972) (recognizing "the fact that certain situations are so disposed as to present a fusion of the doctrines of tort and contract"), overruled by Francis v. Lee Enters., 971 P.2d 707 (Haw. 1999); Gillespie v. Brooklyn H.R. Co., 70 N.E. 857, 858 (N.Y. 1904) (holding that breach of duty by a common carrier gives rise to action in both contract and tort). Nevertheless, it is helpful to emphasize the doctrinal differences that remain and inform this Court's choice of the analogous limitations statute. When one does or fails to do an act which causes harm to another, the consequences are the result of culpability but not necessarily intentional culpability; this is the lynchpin of accountability in tort. But when, as here, one undertakes the affirmative

Because the plaintiff filed this lawsuit 18 months after the alleged breach of warranty of workmanlike performance, the analogous statute of limitations has not expired. Thus, no presumption of laches arises; the burden remains with the defendant to demonstrate that the plaintiff's 18 month delay was inexcusable and that the defendant was prejudiced.[11]

---

responsibility for doing and completing a task...repairing and altering hatch covers...one does so with a nod that the task will be done reasonably well. That is the bond- the contract- between the obligor and obligee. Failure to do so is a violation -- a breach -- of that bond. See Woodward v. Chirco Constr. Co., 687 P.2d 1269, 1271 (Ariz. 1984) (holding that failure to perform in a workmanlike manner does not give rise to tort action absent a breach of an independent duty); Fuchs v. Parsons Constr. Co., 88 N.W.2d 648, 652 (Neb. 1958) ("It is recognized that if an action is not maintainable without pleading and establishing the contract, if the gist of the action is the breach of contract, either by malfeasance or nonfeasance, it is in substance, whatever may be the form of the pleading, an action on the contract.") (reasoning affirmed in L.J. Vontz Construction Co. v. State, 432 N.W.2d 7, 11-12 (1988)). But see National Fire Ins. Co. v. Westgate Constr. Co., 227 F. Supp. 835, 838 (D. Del. 1964) ("Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract."); Securities-Intermountain, Inc. v. Sunset Fuel Co., 611 P.2d 1158, 1167 (Or. 1980) (holding that a breach of a contract term implied in law gives rise to a tort action only). See generally Timothy Davis, The Illusive Warranty of Workmanlike Performance: Constructing a Conceptual Framwork, 72 NEB. L. REV. 981 (1993)(suggesting that the proper view of the implied warranty of workmanlike performance is as an implied in law gap-filling contract term); Prosser, The Assault Upon the Citadel, 69 Yale L. J. 1099, 1126 (1960) (describing breach of implied warranty as a hybrid cause of action).

[11] Even if the plaintiff's claim is characterized as a tort claim for property damage, the result is the same; as noted below, neither inexcusable delay nor prejudice to the defendant has been shown on this record.

2. Excuse

Delay is excusable when "a plaintiff gives defendants notice of the claim and the opportunity to protect their interests within a reasonable time, notwithstanding the fact that the analogous statute of limitations may have expired." Robert B. Miller, 2001 WL 515249, at *2 (citing West Wind Africa Line, Ltd. v. Corpus Christi Marine Services, Co., 834 F.2d 1232, 1234 (5th Cir. 1988)). In Miller, the plaintiff filed suit over three years after the accident in the face of a one-year analogous statute of limitations. The court rejected the defendant's laches defense because the plaintiff had pursued dispute resolution outside the court system: "[B]ecause the defendants were almost immediately placed on notice of the claim, and have had every opportunity to 'build a record' for trial, the Court finds that they have not been prejudiced." Id.; Pizani v. M/V COTTON BLOSSOM, 669 F.2d 1084, 1087 n.1 (5th Cir. 1982) (defendant not prejudiced because it had actual notice of plaintiff's claim); Mecom, 622 F.2d at 1215-16 (defendant not prejudiced when it had prompt notice and opportunity to investigate); Odeco Drilling, Inc. v. M/V CLAIRE TIDE, No. 91-4106. 1992 WL 329514 (E.D.La. Nov. 3, 1992) (no laches when plaintiff sent defendant notice six weeks after collision). There is no record evidence that the plaintiff's delay in filing suit was inexcusable.

3. Prejudice

Even if there were some suggestion that the plaintiff's delay in filing suit was inexcusable, that would be insufficient to find in the defendant's favor on its laches defense. "[T]he party asserting laches must also establish that it has been prejudiced by the delay, that is, that the delay has 'cause[d] a disadvantage in asserting and establishing a claimed right or defense.'" See Nat'l Association of Government Employees v. City Public Service Bd. of San Antonio, Texas, 40 F.3d 698, 707 (5th Cir. 1994) (citation omitted) ("[t]he requirement of demonstrating prejudice dovetails with the equitable nature of laches as a doctrine 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared"). The defendant has failed to show how it has been disadvantaged from the plaintiff's delay in filing suit.[12]

Because the defendant has submitted no evidence supporting its assertion that the plaintiff's delay was inexcusable[13] and because

---

[12] The defendant seems to claim prejudice -- not from the plaintiff's delay in filing suit -- but due to the plaintiff's failure to immediately notify the defendant of the damaged slides and socks.

[13] The plaintiff suggests that the parties were attempting to resolve the claim without resorting to a lawsuit.

15

the record does not establish that the defendant was prejudiced,[14] it has not carried its burden to vindicate the defense of laches. Summary judgment is not appropriate. See Nat'l Association of Government Employees v. City Public Service Bd. of San Antonio, Texas, 40 F.3d 698, 707 (5th Cir. 1994) (noting that it is impermissible for courts to resolve disputed issues of fact

---

[14] The defendant urges that it is a victim of spoilation of evidence and that this satisfies the requirement for "prejudice". The defendant generally relies, collectively, on the three deposition transcripts it has submitted:

> The plaintiff acknowledged that all welding repair work on the vessel's hatches had been completed by Max Welders, took the vessel out of Max Welders' yard, proceeded to work the vessel for a week before it found the pressure tank pumping system to be broken (on the first pumping job the vessel had performed in over two years), and then hired a subcontractor to repair the system without any notice being given to Max Welders, without any opportunity afforded to Max Welders to view the supposedly damaged tanks, and without any independent surveyor making any inspection of the damaged area before it was repaired/renewed.

The record at this stage falls short of establishing prejudice to the defendant from the delay in plaintiff's filing suit due to spoilation of evidence. (The plaintiff disputes that its actions give rise to spoliation; the plaintiff points to the same deposition testimony relied upon by defendant to suggest that photographs of the damaged slides and socks were made and the slides and socks themselves have been retained). Issues of fact abound. However, in response to the defendant's concern, the Court notes that these issues questioning the quality of the plaintiff's evidence will be, at the very least, ones of credibility. It is the Court's function to weigh all of this evidence, make credibility choices, and find the facts. An application for summary relief on this record is wholly inappropriate and patently beyond the purpose of Rule 56.

regarding prejudice in favor of the movant).

   B.   The Merits of the Breach of Warranty Claim

   As an echo of its spoliation issues, the defendant alternatively seeks summary relief on the merits of the plaintiff's main demand. The defendant asserts that the plaintiff is unable to prove its res ipsa loquitur theory because it cannot prove (1) the working condition of the pressure tank pumping system before the Max Welders repair, or (2) the "after" condition of the unworkable pressure tank "because it destroyed all evidence of the alleged problem." That is simply a resurrection of evidence arguments. Genuine issues of material fact obviously remain for trial on these very issues, as made clear by the deposition testimony submitted by the defendant; summary judgment is quite dramatically unavailable in the context of this case.

## III.

   Finally, the defendant seeks summary relief on its counterclaim. Max Welders asserts that KGO may not refuse to pay an uncontested invoice while litigating a contested claim. Max Welders insists that the work was accepted by KGO, never disputed, and that the amount due on the invoice may not be set off. The Court finds that the parties have inadequately addressed the setoff issue and, because the defendant has produced no sworn evidence in support of its claim to the "undisputed" amount on the invoice, the defendant's motion for summary relief on its counterclaim is also

denied.

The defendant's motion for summary judgment is DENIED.[15]

New Orleans, Louisiana, January 22, 2009.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[15] Finally, the Court notes that it has not considered any of Max Welders' arguments that were raised for the first time in its reply brief and cautions counsel to respect the mandate of 28 U.S.C. § 1927.